1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

STUART COLMAN,

            Plaintiff,

    v.

THE CITY OF SEATTLE, *et al.*,

           Defendants.

CASE NO.  C05-0754RSM

ORDER GRANTING IN PART
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

## I.  INTRODUCTION

      This matter comes before the Court on defendants' Motion for Summary Judgment. (Dkt. #42).  Defendants argue that plaintiff's § 1983 claims fail as a matter of law because he is unable to establish a *prima facie* case of retaliation with respect to the City of Seattle, the Seattle Police Department, or Chief Kerlikowske.  Defendants further argue that plaintiff's state law claims fail as a matter of law because: (1) RCW 49.32.020 does not apply to public employees; (2) plaintiff failed to exhaust his administrative remedies; (3) plaintiff cannot make a *prima facie* showing of retaliation because no adverse action was taken against him during the applicable limitations period; (4) if adverse action was taken, plaintiff cannot show that retaliation was a substantial motivating factor; and (5) plaintiff's retaliation claim against Chief

ORDER
PAGE - 1

1    Kerlikowske fails as a matter of law because he did not engage in retaliatory conduct.

2            Plaintiff argues that summary judgment is not appropriate because material facts are in

3    dispute, and this Court can make the necessary inferences to support a *prima facie* case of

4    retaliation with respect to his federal and state law claims.  (Dkt. #62).  Plaintiff further argues

5    that none of his claims are time-barred.

6            For the reasons set forth below, the Court agrees with plaintiff in part, and GRANTS IN

7    PART and DENIES IN PART defendants' motion for summary judgment.

8                                    **II.  BACKGROUND**

9            Plaintiff, Stuart Colman, is a 19-year veteran of the Seattle Police Department ("SPD"),

10   in Seattle, Washington.  He asserts that this action is part of the "ongoing fall-out from the 2001

11   police shooting of Aaron Roberts and the death of Kristopher Kime during the Mardi Gras riot."

12   (Dkt. #20 at 2).

13           In 1999, Officer Colman was assigned to "a highly-sought after and prestigious" position

14   on the SPD Bicycle Patrol Squad ("bike squad").  In early 2001, he was elected vice president of

15   the Seattle Police Officer's Guild ("Guild").

16           Following the death of Kristopher Kime during the Mardi Gras riot in February 2001,

17   Officer Colman was quoted extensively in local and national newspapers, both in his capacity as

18   a police officer and as vice president of the Guild, criticizing decisions made by the Seattle

19   Police Chief, and his handling of the Mardi Gras riot and its aftermath.

20           On or about May 31, 2001, Aaron Roberts was shot and killed in the Central District of

21   Seattle.  On or about July 27, 2001, Mr. Roberts' mother and brother filed a complaint with the

22   Office of Professional Accountability ("OPA") against the shooting officer and his partner.

23   Earlier that month, Officer Colman had publicly expressed the Guild's concerns about how the

24   City of Seattle and the Seattle Police Chief chose the OPA board members.

25           In August 2001, Officer Colman wrote an article for the Guild's newsletter, the

26

ORDER
PAGE - 2

"Guardian," criticizing the downtown Nordstrom store's video and audio taping practices.  In response, the vice president of the Seattle Police Management Association wrote a "scathing" letter to the Guardian, suggesting that Officer Colman may want to reconsider being a police officer.  (Dkt. #20 at 6).

On or about January 28, 2002, in his capacity as vice president of the Guild, Officer Colman publicly defended a fellow officer who had been accused of racial profiling after stopping a group of Asian American students who had been jaywalking.  The OPA had recommended discipline and the Police Chief agreed.  On January 29, 2002, Officer Colman was quoted in the Seattle Post-Intelligencer on behalf of the Guild, stating that "they had lost faith in the chief's willingness to support us, especially when we do the right thing."  (Dkt. #20 at 6-7).

Plaintiff asserts that shortly thereafter his SPD employment began to be affected in negative ways.  For example, plaintiff was informed by his supervisor that he had performance issues, he was denied items of equipment that other officers were allowed to have, his bicycle was not traded for a new one as was the case with other bike squad officers, and he was not allowed to have clipless pedals as other officers were allowed to have.  Plaintiff also asserts that he began to receive assignments that were designed to reduce his statistical productivity.

In February 2002, Officer Colman resigned as vice president of the Guild effective March 14, 2002.  In March 2002, he was the highest statistical performer on the bike squad.

On March 29, 2002, one of Officer Colman's supervisors decided to remove him from the bike squad based on allegations of misconduct.[1]  Specifically, Captain Sanford chastised him for drinking alcohol in uniform.  Officer Colman was asked to leave the bike squad voluntarily; however, Officer Colman refused.

On or about April 4, 2002, Officer Colman was informed that he was being removed

---

[1] Officer Colman's First Amended Complaint alleges the decision was made either by Sergeant Dyment and/or Captain Sanford and/or Lieutenant Emerick.

ORDER
PAGE - 3

from the bike squad, and was being reassigned to the patrol squad, effective April 6, 2002.

Officer Colman continues to work for the patrol squad as of this date.

Officer Colman alleges that, throughout the remainder of 2002, he was subject to false disciplinary charges and accusations that he was spreading scandalous remarks to the press and public about one of his police captains, and was denied vacation and family leave days, transfer requests and training requests, in retaliation for his prior actions as the Guild vice president. Officer Colman further alleges that he has experienced significant economic losses, in part, related to his loss of overtime opportunities available through the bike squad, as well as significant emotional distress.

On March 25, 2005, Officer Colman filed a Claim of Damages with the City Clerk's Office. In his claim, Officer Colman alleged:

> I was interfered with, restrained and coerced in the exercise of my rights under RCW 41.56, RCW 49.32.020 and other statutory provisions, and was the victim of tortious misbehavior, by being transferred out of my bicycle squad assignment and through other retaliatory acts. As a result, I suffered and continue to suffer a significant loss of overtime opportunities, damage to my reputation, emotional distress, and other losses.

(Dkt. #23, Ex. A).

On April 1, 2005, Officer Colman filed the instant action in King County Superior Court, claiming retaliation in violation of RCW 41.56 and RCW 49.32.020, and deprivation of his free speech rights under the First and Fourteenth Amendments of the United States Constitution pursuant to 42 U.S.C. § 1983. Defendants subsequently removed the lawsuit to this Court.

On October 17, 2005, plaintiffs filed their First Amended Complaint, adding Officer Colman's wife, Tracy Colman, as a plaintiff, along with her claim for loss of consortium. Mrs. Colman had never filed a Claim of Damages with the City of Seattle. Defendants followed with a motion to dismiss plaintiff's state law claims for lack of subject matter jurisdiction, and motion to dismiss Mrs. Colman for failure to file a Claim for Damages.

On January 4, 2006, this Court dismissed plaintiff's wife as a plaintiff from this action,

ORDER
PAGE - 4

but declined to dismiss plaintiff's claims, finding that those claims are statutory and do not sound in tort.

This motion for summary judgment followed.

### III.  LEGAL STANDARD

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).   The Court must draw all reasonable inferences in favor of the non-moving party.  *See F.D.I.C. v. O'Melveny & Meyers*, 969 F.2d 744, 747 (9th Cir. 1992), *rev'd on other grounds*, 512 U.S. 79 (1994).  The moving party has the burden of demonstrating the absence of a genuine issue of material fact for trial.  *See Anderson*, 477 U.S. at 257.  Mere disagreement, or the bald assertion that a genuine issue of material fact exists, no longer precludes the use of summary judgment.  *See California Architectural Bldg. Prods., Inc., v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987).

Genuine factual issues are those for which the evidence is such that "a reasonable jury could return a verdict for the non-moving party."  *Anderson,* 477 U.S. at 248.  Material facts are those which might affect the outcome of the suit under governing law.  *See id.*  In ruling on summary judgment, a court does not weigh evidence to determine the truth of the matter, but "only determine[s] whether there is a genuine issue for trial."  *Crane v. Conoco, Inc.*, 41 F.3d 547, 549 (9th Cir. 1994) (citing *O'Melveny & Meyers*, 969 F.2d at 747).  Furthermore, conclusory or speculative testimony is insufficient to raise a genuine issue of fact to defeat summary judgment.  *Anheuser-Busch, Inc. v. Natural Beverage Distributors*, 60 F. 3d 337, 345 (9th Cir. 1995).  Similarly, hearsay evidence may not be considered in deciding whether material facts are at issue in summary judgment motions.  *Anheuser-Busch, Inc. v. Natural Beverage*

*Distribs.*, 69 F.3d 337, 345 (9th Cir. 1995); *Blair Foods, Inc. v. Ranchers Cotton Oil,* 610 F. 2d 665, 667 (9th Cir. 1980).

## IV.  DISCUSSION

### A.  Plaintiff's Conceded Claims

In their motion for summary judgment, defendants argue that plaintiff improperly named the SPD as a defendant in this case, even though the SPD is not an independent entity subject to suit.  Defendants further argue that individual defendant Chief Kerlikowske can not be held liable in his individual capacity under § 1983 because plaintiff has failed to allege that Chief Kerlikowske was personally involved in any alleged deprivation of rights, and because plaintiff failed to demonstrate any causal connection between Chief Kerlikowske and the alleged deprivation of rights.  Defendants argue that plaintiff's state law claims against Chief Kerlikowske must also fail for similar reasons.  Finally, defendants argue that plaintiff's alleged violations of RCW 49.32.020 must fail because that statute does not apply to public employers and employees.

Plaintiff has failed to respond to any of these arguments.  Thus, it appears that he concedes summary judgment is appropriate on those claims.  *See* Local Rule CR 7(b)(2) (stating that "[i]f a party fails to file papers in opposition to a motion, such failure may be considered by the court as an admission that the motion has merit.").  Accordingly, the Court will dismiss Chief Kerlikowske and the SPD as defendants in this case, and will dismiss plaintiff's claim under RCW 49.32.020.

### B.  Plaintiff's § 1983 Claims

#### 1.  First Amendment Violations

In order to sustain a claim of retaliation in violation of the First Amendment against a public employer, "an employee must show (1) that he or she engaged in protected speech; (2) that the employer took 'adverse employment action'; and (3) that his or her speech was a

ORDER
PAGE - 6

1  'substantial or motivating' factor for the adverse employment action." *Coszalter v. City of*

2  *Salem*, 320 F.3d 968, 973 (9th Cir. 2003) (citations omitted); *Huskey v. City of San Jose*, 204

3  F.3d 893, 899 (9th Cir. 2000).  The Court addresses each of these factors in turn.

4  <u>a.  Protected Speech</u>

5        The Court must first determine whether plaintiff's speech was "constitutionally

6  protected," and in doing so, must examine whether the speech touches "on a matter of public

7  concern."  *Moran v. State of Washington*, 147 F.3d 839, 846 (9th Cir. 1998).

8        In *Moran*, the Ninth Circuit Court of Appeals explained that

9      [a]s a threshold matter, the speech must touch on a matter of "public
   concern."  If it does not, then the First Amendment is not implicated at all,
10  and "it is unnecessary . . . to scrutinize the reasons for [the adverse action
   against the employee]."  If it does, then the reviewing court must determine
11  whether the employee's interest in expressing herself outweighs her
   employer's interest in preventing potential workplace disruption. In striking
12  that balance, courts look to the so-called *Pickering* balancing test, named for
   the case in which the standard was articulated: "The question of whether
13  speech of a government employee is constitutionally protected expression
   necessarily entails striking 'a balance between the interests of the [employee],
14  as a citizen, in commenting on matters of public concern and the interest of
   the State, as an employer, in promoting the efficiency of the public services
15  it performs through its employees.'"

16  *Moran*, 147 F.3d at 846 (citations omitted).

17        When undertaking this analysis, the Court will look at the "content, form and context"

18  of the statement based on the record as a whole.  *Pickering v. Board of Education*, 391 U.S.

19  563, 571 (1968); *Connick v. Meyers*, 461 U.S. 138, 142 and 149-50 (1983).  The "content" of

20  speech is determined by looking at whether it identifies "issues about which information is

21  needed or appropriate to enable members of society to make informed decisions about the

22  operation of their government."  *Weeks v. Bayer*, 246 F.3d 1231, 1234 (9th Cir. 2001).  The

23  "form and context" of speech looks at factors such as the purpose of the speech, and the

24  motivation and audience chosen for the speech.  *Ulrich v. City and County of San Francisco*,

25  308 F.3d 968, 979 (9th Cir. 2002).  "'Content is the greatest single factor in the *Connick*

26

ORDER
PAGE - 7

inquiry.'" *Johnson v. Multnomah County*, 48 F.3d 420, 424 (9th Cir. 1995) (citation omitted).

In evaluating the content of the speech, federal courts have recognized certain subjects as inherently of public concern.   For example, in *Givhan v. Western Line Consol. School Dist.*, 439 U.S. 410 (1979), the U.S. Supreme Court held that a public school teacher's private comments to the school principal charging racially discriminatory policies and practices within the district were public expression warranting protection under *Pickering*, and the *Connick* Court subsequently characterized Givhan's allegations "a matter inherently of public concern." *Connick*, 461 U.S. at 148 n.8.  "Courts have also identified the misuse of public funds, wastefulness, and inefficiency in managing and operating government entities as matters of public concern." *Roth v. Veteran's Admin. of United States*, 856 F.2d 1401, 1405 (9th Cir. 1988); *see also Hamer v. Brown*, 831 F.2d 1398 (8th Cir. 1987); *Czurlanis v. Albanese*, 721 F.2d 98 (3d Cir. 1983).

However, the Ninth Circuit cautioned in *Roth*, *supra*, that not all speech concerning public monies or government inefficiency automatically deserves protection.  *Roth*, 856 F.2d at 1405 (citing to *Barnes v. McDowell*, 848 F.2d 725 (6th Cir. 1988)).  "To aid us in ascertaining when speech of this type rises to a level of public concern, we examine the context of the speech, particularly the point of the speech.  In *Connick*, *supra*, the Supreme Court emphasized the distinction between speech that 'seek[s] to bring to light actual or potential wrongdoing or breach of public trust,' which warrants protection, and speech that merely reflects one employee's dissatisfaction with [his or] her employment." *Id.* (citations omitted).

In the instant case, plaintiff points to two categories of speech for which he feels he suffered retaliation.[2]  First, plaintiff points to comments he made publicly as vice president of the

---

[2] Defendants identify a third category of speech as the anonymous "Green Avenger Letter" highlighted in plaintiff's Complaint.  However, plaintiff does not address that letter in his Response, nor does he actually take responsibility for authoring the letter.  Rather, he notes that he was accused of writing it, and was told by a fellow employee that everyone thought he wrote it.  Thus, it does not appear to this Court that plaintiff actually asserts that the Green Avenger Letter constitutes protected speech,

ORDER
PAGE - 8

1   Guild and in his individual capacity criticizing the SPD's decision not to intervene in the Mardi

2   Gras riots.  In that same category, plaintiff points to comments he made criticizing the SPD's

3   handling of other high profile tragedies, such as the police shooting of Aaron Roberts, and the

4   treatment of a fellow officer accused of racial profiling.  Plaintiff argues that this speech touches

5   on a matter of public concern because the public is interested in the actions taken by its police

6   department in order to make political decisions about who runs the police department and the

7   policies set by the department and city.  Defendants do not argue otherwise, and the Court

8   agrees that this speech is protected speech.

9        Second, plaintiff points to statements he made in the SPOG newsletter, The Guardian,

10   about the downtown Nordstrom store's video and audio taping practices.  Plaintiff asserts that

11   his purpose in making those statements was to expose how a major retailer challenges the acts of

12   police officers, and how the SPD considered that information.  Defendants assert in conclusory

13   fashion that this speech is not of concern to the community, and therefore should not be

14   protected.  The Court disagrees.  It appears that plaintiff was attempting to "'bring to light

15   actual or potential wrongdoing or breach of public trust,' which warrants protection." *Roth*,

16   856 F.2d at 1405 (citation omitted).

17        Accordingly, the Court finds that plaintiff did engage in protected speech when

18   criticizing SPD practices related to the SPD's handling of the Mardi Gras riots and other high

19   profile tragedies, such as the police shooting of Aaron Roberts, and the treatment of a fellow

20   officer accused of racial profiling through various newspaper articles, and when he criticized

21   Nordstrom video and audio taping practices in the Guardian.

22                          b.  Adverse Employment Action

23        Defendants next argue that plaintiff has failed to demonstrate any adverse employment

24

25   _____

26   and the Court will not treat it as such.  Moreover, because plaintiff has not admitted that he wrote the
     letter, he cannot claim that it constitutes his protected speech.

ORDER
PAGE - 9

action.  Specifically, defendants argue that plaintiff's claims involving his removal from the bike squad are time barred, and plaintiff's remaining allegations are not "adverse actions" as a matter of law.

In *Coszalter*, the Ninth Circuit Court of Appeals adopted the "reasonably likely to deter" test as the proper test for First Amendment employer retaliation cases. *Coszalter*, 320 F.3d at 976.  The court explained:

> [t]he precise nature of the retaliation is not critical to the inquiry in First Amendment retaliation cases.  The goal is to prevent, or redress, actions by a government employer that "chill the exercise of protected" First Amendment rights.  Various kinds of employment actions may have an impermissible chilling effect.  Depending on the circumstances, even minor acts of retaliation can infringe on an employee's First Amendment rights.
>
> To constitute an adverse employment action, a government act of retaliation need not be severe and it need not be of a certain kind.  Nor does it matter whether an act of retaliation is in the form of the removal of a benefit or the imposition of a burden. . . .
>
> In some cases, the would-be retaliatory action is so insignificant that it does not deter the exercise of First Amendment rights, and thus does not constitute an adverse employment action within the meaning of the First Amendment retaliation cases.  In *Nunez*, the plaintiff had only shown "that he was bad-mouthed and verbally threatened."  We concluded that such actions, even if taken in response to protected speech, did not constitute an adverse employment action.

*Coszalter*, 320 F.3d at 974-76 (citation omitted).

In this case, plaintiff alleges that he was removed from his "highly-sought after and prestigious" position on the bike squad in retaliation for his public comments criticizing certain actions by the SPD, and in particular, Chief Kerlikowske.  That removal occurred on April 4, 2002.  Defendants do not argue that his removal from the bike squad was not an adverse action.  Rather, defendants argue that any claims stemming from that removal are time barred because plaintiff knew or should of known he would be removed as early as March 29, 2002, but he did not file the instant action until April 1, 2005, after the three-year statute of limitations period expired.  Defendants assert that this Court should look to when the decision to remove plaintiff

ORDER
PAGE - 10

from the bike squad was made, as opposed to when the decision was carried out, for purposes of the statute of limitations.

Defendants rely on *RK Ventures, Inc. v. City of Seattle*, 307 F.3d 1045 (9th Cir. 2002), which explained that when determining whether a discrete action accrued within the statute of limitations period, "the question is when the operative decision was made, not when the decision is carried out." *RK Ventures*, 307 F.3d at 1059. Thus, defendants assert that plaintiff's claim based on his removal from the bike squad accrued no later than June 1, 2002. The Court is not persuaded.

In *RK Ventures*, the court explicitly noted that "a particular decision will not be the 'operative decision' where it is not a final one. The statute runs from the final decision, not a tentative or preliminary one. *RK Ventures*, 307 F.3d at 1060 n. 10 (citing *McCoy v. San Francisco, City & County*, 14 F.3d 28, 30 (9th Cir. 1994)); *see Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 927 (9th Cir. 2004) (holding that the claim accrued when the final position of the decision maker had been rendered). The Court agrees with plaintiff that his termination was final on the day that it occurred, and, therefore, his claims stemming from his removal from the bike squad on April 4, 2002, are not time barred.

Defendants next argue that the other actions of which plaintiff complains are not "adverse" actions as a matter of law. The Court agrees with respect to plaintiff's complaint that a letter of commendation pertaining to him was never put in his personnel file, and with respect to his complaint that he did not receive adequate funeral leave. Plaintiff admits that a response letter acknowledging the commendation is in his personnel file, and records show that plaintiff requested and was paid for five days of funeral leave time, not three days as alleged in his Complaint.

With respect to the remaining alleged adverse actions, the Court finds under the "reasonably likely to deter" test set forth above, the following actions are adverse employment

actions: (1) reprimand by Lieutenant Vandergiessen on or about May 17, 2002 for two instances of tardiness that allegedly did not occur; (2) revocation of authorized vacation day by Lieutenant Vandergiessen on or about May 23, 2002; (3) denial of transfer request on or about June 10, 2002; (4) denial of trade request by Captain Oliver on or about September 2002; (5) denial of Family Medical Leave on or about October 30, 2002; (6) denial of patrol rifle and FTO training on or about January 29, 2004; and (7) denial of patrol rifle training on or about September 8, 2004.

Having determined that plaintiff did suffer adverse employment actions, the Court now turns to the question of whether plaintiff has demonstrated that his protected speech was the substantial or motivating factor for these actions.

<u>c.  Substantial or Motivating Factor</u>

In the instant case, plaintiff relies on circumstantial evidence to demonstrate a genuine issue of material fact as to retaliatory motive.  In such a case, the Ninth Circuit Court of Appeals has explained that

> [i]n the free speech cases in which we have held that circumstantial evidence created a genuine issue of material fact on the question of retaliatory motive, the plaintiff, in addition to producing evidence that his employer knew of his speech, produced evidence of at least one of the following three types.  First, we have held that a plaintiff created a genuine issue of material fact where he produced the additional evidence that the "proximity in time between the protected action and the allegedly retaliatory employment decision" was one in which a "jury logically could infer [that the plaintiff] was terminated in retaliation for his speech."  Second, we have held that a plaintiff created a genuine issue of material fact where he produced the additional evidence that his employer expressed opposition to his speech, either to him or to others.  Third, we have held that a plaintiff created a genuine issue of material fact where he produced the additional evidence that his employer's proffered explanations for the adverse employment action were false and pretextual.

*Keyser v. Sacramento City Unified Sch. Dist.*, 265 F.3d 741, 751-52 (9th Cir. 2001) (citations omitted).

The Court finds that plaintiff has presented evidence that the acts he complains of, and which this Court considers to be adverse employment actions, occurred after he engaged in

ORDER
PAGE - 12

1    protected speech, and that at least some of the explanations for these actions were pretextual.

2    Defendants do not actually dispute that they had knowledge of plaintiff's speech.

3         In this case, plaintiff made numerous statements published in newspapers during 2001

4    and 2002.  At the end of January 2002, plaintiff stated that the Guild had lost faith in Chief's

5    Kerlikowske's willingness to support Seattle police officers.  Approximately three months later,

6    he was removed from the bike squad.  The Court of Appeals has held that such a time period

7    can support an inference of retaliation.  *Coszalter*, 320 F.3d at 977-78.  Similarly, the Court

8    finds that the timing of the reprimand by Lieutenant Vandergiessen on or about May 17, 2002

9    for two instances of tardiness that allegedly did not occur, the attempted revocation of

10   authorized vacation day by Lieutenant Vandergiessen on or about May 23, 2002, the denial of

11   transfer request on or about June 10, 2002, the denial of trade request by Captain Oliver on or

12   about September 2002 and the denial of Family Medical Leave on or about October 30, 2002,

13   also support an inference of retaliation.

14        However, the Court finds that the denials of requests for training in January and

15   September 2004 occurred too long after plaintiff's protected speech to support an inference of

16   retaliation.  Those actions occurred more than two years after he engaged in protected speech,

17   and there is no evidence of any other adverse employment action taken between the end of 2002

18   and the end of 2003.

19        Beyond these facts concerning timing of the actions taken, plaintiff has also provided

20   evidence that the defendants' proffered explanations as to some of the acts taken was pretextual.

21   For example, plaintiff produces evidence that he was reprimanded for conduct in which other

22   officers had engaged but were not reprimanded, such as drinking alcohol while in uniform.  In

23   addition, plaintiff has produced evidence of a superior officer utilizing the Washington State

24   Department of Licensing computer database to search for his home address so he could go to

25   plaintiff's home and personally revoke an authorized vacation day.  That type of conduct by a

26

ORDER
PAGE - 13

1   superior officer appears to be without precedent.  The Court believes that a reasonable fact

2   finder could find that the inconsistent application of these policies was retaliation for his

3   constitutionally protected speech.  The Court also believes that a reasonable fact finder could

4   find that "pretextual explanation[s] such as [these] casts doubt on other explanations that,

5   standing alone, might appear to be true."  *CoszalterI,* 320 F.3d at 978.

6       For all of these reasons, the Court finds that plaintiff has raised genuine issues of material

7   fact as to retaliatory motive, and summary judgment is not appropriate.

8                       d. Defendant Would Have Taken Same Action

9       Even if a plaintiff has demonstrated a *prima facie* case of retaliation, defendants are still

10  entitled to summary dismissal if it demonstrates that it would have taken the same actions in the

11  absence of the employee's speech.  *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S.

12  274, 287 (1977).  In this case, the Court has already determined that some of defendants

13  explanations are pretextual, and therefore cast doubt on the remaining explanations.

14  Accordingly, the Court finds that defendants cannot demonstrate beyond a preponderance of the

15  evidence that they would have taken the same actions in absence of plaintiff's protected speech.

16  Accordingly, summary judgment is not appropriate.

17                       *2.  Municipal Liability*

18      Having determined that plaintiff has adequately demonstrated a *prima facie* case of

19  retaliation, defendant has not demonstrated that it would have taken the same actions in the

20  absence of plaintiff's speech, and having dismissed Chief Kerlikowske and the SPD as

21  defendants in this action, the Court must now determine whether plaintiff can pursue his claims

22  against the only remaining defendant City of Seattle.  To establish municipal liability for a

23  violation of a plaintiff's constitutional rights, city policy, practice or custom must cause such

24  violation.  *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978).

25  "It is only when the 'execution of the government's policy or custom . . . inflicts the injury' that

26

1    the municipality may be held liable under § 1983." *Springfield v. Kibbe*, 480 U.S. 257, 267

2    (1987) (O'Connor, J., dissenting) (quoting *Monell*, 436 U.S. at 694).  The *Monell* Court

3    emphasized that:

4        a municipality cannot be held liable solely because it employs a tortfeasor --
         or, in other words, a municipality cannot be held liable under § 1983 on a
5        *respondeat superior* theory. . . .
         . . .
6        Therefore, . . . a local government may not be sued under § 1983 for an injury
         inflicted solely by its employees or agents.  Instead, it is when execution of a
7        government's policy or custom, whether made by its lawmakers or by those
         whose edicts or acts may fairly be said to represent official policy, inflicts the
8        injury that the government as an entity is responsible under § 1983.

9    *Monell*, 436 U.S. at 691 and 694 (emphasis in original); *see also Collins v. City of Harker*

10   *Heights*, 503 U.S. 115, 121 (U.S. 1992).  Thus, the Court must first inquire whether there is a

11   direct causal link between a municipal policy or custom and the alleged constitutional

12   deprivation.  *City of Canton v. Harris*, 489 U.S. 378, 385-86 (1989).

13       The Ninth Circuit has clarified that

14       [f]or purposes of *Monell* liability, the term "policy" includes within its
         definition not only policy in the ordinary sense of a rule or practice applicable
15       in many situations.  It also includes "a course of action tailored to a particular
         situation and not intended to control decisions in later situations."

16

17   *Lytle v. Carl*, 382 F.3d 978, 983 (9th Cir. 2004) (citation omitted).  Furthermore,

18       [i]f the decision to adopt that particular course of action is properly made by
         that government's authorized decisionmakers, it surely represents an act of
19       official government 'policy' as that term is commonly understood.  More
         importantly, where action is directed by those who establish governmental
         policy, the municipality is equally responsible whether that action is to be
20       taken only once or to be taken repeatedly.

21   *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986).  With that guidance, the Court finds

22   that plaintiff has sufficiently demonstrated a municipal policy with a direct causal link to the

23   alleged constitutional violation.  Accordingly, the Court will allow plaintiff to proceed with his §

24   1983 claims against defendant City of Seattle.

25       **C.  Plaintiff's State Claims**

26

ORDER
PAGE - 15

The Court now turns to plaintiff's state law claims.  As noted above, plaintiff has apparently conceded that his alleged violations of RCW 49.32.020 must fail because that statute does not apply to public employers and employees.  Accordingly, the Court only address defendants' arguments with respect to plaintiff's alleged violations of RCW 41.56.040.

### 1.  Failure to Exhaust Administrative Remedies

Defendants first argue that plaintiff's claims under RCW 42.56.040 are precluded for failure to exhaust administrative remedies.  Relying on *Ryder v. Port of Seattle*, 50 Wn. App. 144 (1987), defendants argue that because plaintiff's claims were cognizable in the first instance by the Public Employment Relations Committee ("PERC"), he was required to bring his claims before it, prior to seeking review in this Court.  The Court finds defendants' arguments misplaced.

In *Ryder*, the Washington Court of Appeals determined that the plaintiff was required to exhaust his claim under RCW 41.56 before PERC prior to bringing the claim to state court.  In reaching that conclusion, the court correctly stated the exhaustion doctrine as:

> "[a]dministrative remedies must be exhausted before the courts will intervene: (1) 'when a claim is cognizable in the first instance by an agency *alone*'; (2) when the agency's authority 'establishes clearly defined machinery for the submission, evaluation and resolution of complaints by aggrieved parties'; and (3) when the 'relief sought . . . can be obtained by resort to an exclusive or adequate administrative remedy'."

*Ryder*, 50 Wn. App. at 151 (citations omitted) (emphasis added).  The court then determined, without explanation that the plaintiff's claim was cognizable in the first instance by PERC.  *Id.* Significantly, the court did not make any mention that the plaintiff's claim was cognizable in the first instance by PERC *alone*, as required by the exhaustion doctrine.  However, the court apparently made that presumption.  *Id.* at 152 (stating "[h]ere Ryder's statutory right to file an unfair labor practice complaint was with an administrative agency, not the court. . . ".).

While not explicitly overruling *Ryder*, subsequent Washington Supreme Court decisions reveal the flaw in its reasoning.  In *City of Yakima v. Int'l Assn. of Fire Fighters*, 117 Wn.2d

ORDER
PAGE - 16

655 (1991), the court explained that

> PERC unquestionably has authority to rule on unfair labor practice complaints. Indeed, PERC is recognized both by statute, and case law as possessing expertise in the labor relations area. However, this expertise and authority do not divest the superior courts of jurisdiction in all cases to resolve unfair labor practice complaints which involve interpretation of public employee bargaining statutes. Both PERC and the court thus had the authority to resolve the question posed in this case.

*Yakima*, 117 Wn.2d at 674-75. Thus, it is clear that some unfair labor practice complaints may be cognizable in the courts in the first instance and not solely in the agency. Accordingly, the Court is not persuaded that a plaintiff is always required to exhaust administrative remedies before bringing a claim in court.

Likewise, the Court finds that plaintiff was not required to exhaust his administrative remedies in this case. The only question before this Court is interpretation of the applicable statute, here RCW 41.56, in order to determine whether an unfair labor practice existed under the facts of this case. "Interpretation of a statute is solely a question of law and within the conventional competence of the court. Therefore, resort to PERC is not necessary since it has no special competence over the controversy." *Graham v. Northshore School District*, 99 Wn.2d 232, 242 (1983).

### 2. Statute of Limitations

Defendants next argues that plaintiff's claim is untimely. Defendants assert that RCW 41.56.160 provides only a six month period in which an unfair labor practice claim may be filed. While that may be true for claims brought before PERC, to which the statute specifically applies, the same is not true for this Court. Nothing in the statute suggests that this Court must utilize PERC's 6-month statute of limitations.

Defendants suggest in a footnote that Washington's two-year catchall statute of limitations applies. However, for the reasons set forth by plaintiff, this Court is more persuaded that the three-year statute of limitations applies, and this claim was timely filed.

ORDER
PAGE - 17

1

                    *3. Retaliation Claim*

2

            In order to establish a *prima facie* case of a violation under RCW 41.56, *et seq.*, plaintiff

3

must show that (1) he engaged in protected conduct; and (2) this conduct was a substantial or

4

motivating factor for the "interference," "restraint," or "coercion" that subsequently occurred.

5

*Christensen v. Grant County Hosp. Dist. No. 1*, 152 Wn.2d 299, 309 (2004).  Defendants

6

concede for purposes of summary judgment that plaintiff's has demonstrated prong one of this

7

test.  However, defendants argue that plaintiff has failed to show that the conduct was a

8

substantial or motivating factor of the alleged violations of his rights.

9

            For the reasons discussed above with regard to plaintiff's § 1983 claims, the Court has

10

determined that plaintiff has raised genuine issues of material fact as to whether there was a

11

retaliatory motive for the actions taken by defendants.  Accordingly, the Court finds that

12

summary judgment is not appropriate on this issue.

13

**V.  CONCLUSION**

14

            The Court, having reviewed defendants' motion, plaintiff's opposition, defendants' reply,

15

the declarations and exhibits in support of those briefs, and the remainder of the record, hereby

16

ORDERS:

17

            (1)  Defendants' Motion for Summary Judgment (Dkt. #42) is GRANTED IN PART

18

and DENIED IN PART as follows:

19

            a.  Defendant R. Gil Kerlikowske is DISMISSED as a defendant to this action;

20

            b.  Defendant Seattle Police Department is DISMISSED as a defendant to this action;

21

and

22

            c.  Plaintiff's claim under RCW 49.32.020 is DISMISSED.

23

            d.  Plaintiff's remaining federal and state claims against defendant City of Seattle are not

24

dismissed and continue in this litigation, with two limitations – (i) this Court has now determined

25

that plaintiff's complaint that a letter of commendation pertaining to him was never put in his

26

ORDER
PAGE - 18

1   personnel file and that he did not receive adequate funeral leave, are not adverse employment

2   actions as discussed above; and (ii) the Court has now determined that the denials of requests

3   for certain training in January and September 2004 occurred too long after plaintiff's protected

4   speech to support an inference of retaliation.

5          (2)  The Clerk shall forward a copy of this Order to all counsel of record.

6          DATED this 30th day of June, 2006.

7

8

9          RICARDO S. MARTINEZ
           UNITED STATES DISTRICT JUDGE
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

ORDER
PAGE - 19